```
1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,      )
                                    )
5                    Plaintiff,     )
                                    )
6                                   )  No. 1:09-cr-10210-DPW
     vs.                            )
7                                   )
                                    )
8    DIMITRI LONG,                  )
                     Defendant.     )
9


10

     BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
11

12

                         RULE 11/PLEA HEARING
13

14

15

           John Joseph Moakley United States Courthouse
16                     Courtroom No. 1
                       One Courthouse Way
17                     Boston, MA 02210
                   Monday, November 29, 2010
18                        9:15 a.m.

19

20

21             Brenda K. Hancock, RMR, CRR
                   Official Court Reporter
22       John Joseph Moakley United States Courthouse
                      One Courthouse Way
23                    Boston, MA 02210
                       (617)439-3214
24

25
```

1    APPEARANCES:

2         UNITED STATES ATTORNEY'S OFFICE
          By:  KENNETH G. SHINE, AUSA
3         1 COURTHOUSE WAY
          BOSTON, MA 02210
4         ON BEHALF OF THE UNITED STATES OF AMERICA.

5

6         LAW OFFICE OF STEPHEN J. WEYMOUTH
          BY:  STEPHEN J. WEYMOUTH, ESQ.
7         SUITE 3
          65a ATLANTIC AVENUE
8         BOSTON, MA 02110
          ON BEHALF OF THE DEFENDANT.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2    before the Honorable Douglas P. Woodlock, United States

3    District Judge, United States District Court, District of

4    Massachusetts, at the John J. Moakley United States Courthouse,

5    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6    Monday, November 29, 2010):

7          THE CLERK:  This is the matter of the United States

8    versus Dimitri Long, Criminal Action 09-10210.

9          THE COURT:  Well, I have a signed copy of the Plea

10   Agreement dated November 23rd indicating the defendant's

11   intention to plead guilty to a Superseding Information here.

12         So, I will ask Mr. Lovett to swear the defendant, and

13   I will ask him some questions.

14            DIMITRI LONG, DULY SWORN BY THE CLERK

15         THE COURT:  You may be seated, Mr. Long.

16         Mr. Long, the purpose of this hearing is to satisfy me

17   that what appears to be your intention to plead guilty to what

18   is called a "Superseding Information" is a knowing and

19   voluntary act on your part, and in order for me to make that

20   kind of determination, I have to ask you some questions, and

21   some of the questions are personal in nature.  I want you to

22   understand that I am not trying to delve into your personal

23   life, except as it makes it possible for me to decide whether

24   or not you know what you are doing and what you are doing is

25   voluntary.

1          Do you understand?

2          THE DEFENDANT:  I do, your Honor.

3          THE COURT:  Can you tell me how old a man you are?

4          THE DEFENDANT:  34.

5          THE COURT:  How far did you get in school?

6          THE DEFENDANT:  Halfway through the 12th grade.

7          THE COURT:  Where was that?

8          THE DEFENDANT:  Norwood High School.

9          THE COURT:  And why did you leave high school?

10          THE DEFENDANT:  I believe I ended up getting

11   incarcerated.

12          THE COURT:  For what?

13          THE DEFENDANT:  For it was, I believe, a dangerous

14   weapon and hyperdermic syringes.

15          THE COURT:  Now, during the past 14 years have you had

16   any work, any gainful employment?

17          THE DEFENDANT:  I have.

18          THE COURT:  What has that been?

19          THE DEFENDANT:  A union laborer.

20          THE COURT:  In the Laborers' Union?

21          THE DEFENDANT:  Yes, I'm in the Laborers' Union.  And

22   a freelance tattoo artist.

23          THE COURT:  I'm sorry?

24          THE DEFENDANT:  A freelance tattoo artist.

25          THE COURT:  Now, have you had any difficulty

1    understanding what this case is about, what the Government is

2    accusing you of?

3            THE DEFENDANT:  No, no difficulty.

4            THE COURT:  Now, have you ever had any problem with

5    substance abuse yourself, either drugs or alcohol?

6            THE DEFENDANT:  I have.

7            THE COURT:  Explain it to me.

8            THE DEFENDANT:  I started using drugs at an early age,

9    and I --

10           THE COURT:  What kind of drugs?

11           THE DEFENDANT:  I started drinking at 9 after my

12   father was murdered, and by 12 I met an older guy who turned me

13   onto drugs, and I started smoking marijuana and doing a variety

14   of different drugs.

15           THE COURT:  What other drugs besides marijuana?

16           THE DEFENDANT:  Heroin, cocaine, PCP, LSD.

17           THE COURT:  When was the last time you used drugs?

18           THE DEFENDANT:  I believe it was the day before I was

19   arrested for bank robbery.

20           THE COURT:  And that was about how long ago?

21           THE DEFENDANT:  Eighteen months ago.

22           THE COURT:  Now, that what I take to be a long-term

23   experience with abusing substances like alcohol and various

24   kinds of drugs can have an effect on a man over a period of

25   time.  Do you think that that effect is interfering with your

1    ability to make a judgment on an important matter like this,

2    pleading guilty to several serious felonies that interferes

3    with your ability to understand what you are doing?

4            THE DEFENDANT:  I know what I'm doing, your Honor.

5    Thank you.

6            THE COURT:  Are you satisfied you know what you are

7    doing?

8            THE DEFENDANT:  Yes.

9            THE COURT:  Now, are you taking any prescription drugs

10    at this point?

11            THE DEFENDANT:  No.

12            THE COURT:  Are you seeing a physician for any kind of

13    physical problem?

14            THE DEFENDANT:  No.

15            THE COURT:  Have you ever had occasion to consult with

16    a mental health profession, like a psychiatrist, a

17    psychologist, a psychiatric social worker, anyone like that?

18            THE DEFENDANT:  In State Prison I was diagnosed with

19    Attention Deficit Hyperactivity Disorder and PTSD.

20            THE COURT:  And when was that?

21            THE DEFENDANT:  It was between 2004 and 2008.

22            THE COURT:  And have you consulted with mental health

23    professionals dealing with that?

24            THE DEFENDANT:  Currently and in jail?

25            THE COURT:  Yes.

1          THE DEFENDANT:  No.  They're useless.  Where I'm at,

2     they're useless.

3          THE COURT:  So, you have decided that they are not

4     very helpful to you?

5          THE DEFENDANT:  Your Honor, I had an incident in the

6     jail eight months ago, where it turned my whole outlook upon

7     the jail system, where I have no faith in that jail, your

8     Honor.  I have gotten in an incident with the police where I

9     was drinking home brew, where I ended up trying to kill myself,

10    and the cops beat me within an inch of my life.  And while I

11    was in the chair, in this chair, the lieutenants, they were

12    spraying mace in my nose, in my mouth, put a mask over my head,

13    beat my -- punching my head while I was in the mask and I'm

14    cuffed -- being cuffed to a chair, and there was a worker, an

15    inmate worker, who seen this and, he said, my lifeless,

16    unconscious body, and the whole -- the cops couldn't even

17    believe that they did it to me.  The video, nobody wants to --

18          I got nothing to say about that jail, your Honor.

19          THE COURT:  Well, I guess --

20          THE DEFENDANT:  I got no faith in their mental

21    health --

22          THE COURT:  So, let me just be clear about this.  You

23    do not consult with the mental health professionals?

24          THE DEFENDANT:  I don't trust anybody down there.

25          THE COURT:  Now, those two diagnoses sometimes lead to

1  medications.  Have you taken any medications for this?

2          THE DEFENDANT:  No.  When I was a child I took

3  Ritalin, I believe.

4          THE COURT:  When you were a child?

5          THE DEFENDANT:  Yes.

6          THE COURT:  But you are not taking any medications at

7  this point?

8          THE DEFENDANT:  No.

9          THE COURT:  Now, you understand that you do not have

10  to plead guilty in this case --

11          THE DEFENDANT:  I do.

12          THE COURT:  -- but that you have entered into what

13  appears to be a Plea Agreement, and that is the letter dated

14  November 29th, and it is signed, I believe, today by both you

15  and Mr. Weymouth, setting forth the terms of an agreement by

16  which you are going to plead guilty to eight counts of armed

17  bank robbery in this case.

18          Now, is this the entire agreement between you and the

19  Government?

20          THE DEFENDANT:  I believe so, your Honor.

21          THE COURT:  Well, did anybody promise you anything

22  that is not in this Plea Agreement?

23          THE DEFENDANT:  Well, technically, I mean, I believe

24  the agreement is supposed to be for 235 months, and it was 240,

25  but five months ain't much of a difference, so, I mean, I'm

1   just grateful they ain't -- that the Government's not, you

2   know, putting in the superseding indictment for the

3   18 U.S.C. two, one -- 3559, which is the mandatory life in

4   prison, which it was kind of, If you don't take the agreement,

5   we're going to file this.  So, I mean, I'm grateful for the,

6   you know, for the sentence recommendation, but it's only five

7   months' difference, but five months is five months when -- I

8   ain't got much time left.  As it is, my mother ain't going to

9   be alive that long, I have nobody left, and five months is, you

10  know what I mean, even if I am trying to get as close to the

11  door as I can while she's still alive, you know.  But, I mean,

12  I'm grateful for the 240 months.

13          THE COURT:  Well, it is less an issue of what the

14  prior negotiations were between you and the Government as it is

15  whether or not this agreement that you have signed is --

16          THE DEFENDANT:  I'm satisfied.

17          THE COURT:  -- is the entire agreement between you and

18  the Government.  Is it the entire agreement?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Nobody threatened you in any way to get

21  you to plead guilty?

22          THE DEFENDANT:  No way.

23          THE COURT:  And nobody promised you something that is

24  not in this agreement to get you to plead guilty?

25          THE DEFENDANT:  I am satisfied with that agreement,

1   your Honor.

2          THE COURT:   Well, more than satisfied.   We are focused

3   on two things in our discussion.   First, the Agreement in the

4   third paragraph, second paragraph under the Section 1, that

5   says that the Government has agreed not to file an information

6   pursuant to 18 U.S.C. Section 3559(c)(1)(A) in this matter.

7   That is a provision that, given your background and this set of

8   offenses, might lead to, as you say, a mandatory life

9   imprisonment.   And the Government's given that up; they are not

10  going to file that Information.

11         Do you understand that?

12         THE DEFENDANT:   Yes, I do.

13         THE COURT:   And, second, the Government has indicated

14  that its intention is, together with you, to jointly recommend

15  a sentence of incarceration for a term of 240 months.   Now,

16  based on our discussion this morning, I gather that there was

17  some discussion of a lesser amount at some point.   But now you

18  are agreeing to jointly recommend a sentence of 240 months; is

19  that correct?

20         THE DEFENDANT:   That is, your Honor.

21         THE COURT:   Now, you understand that the penalties

22  that can be imposed in this case on each of the counts are 25

23  years' imprisonment, supervised release for a period of five

24  years, a fine of $250,000 and a mandatory special assessment of

25  $100?

1          Do you understand that those are the sentences that

2     could be imposed in this case?

3          THE DEFENDANT:  I do, your Honor.

4          THE COURT:  And do you understand that this sentence

5     that the parties have come to agree upon as the appropriate

6     sentence is one that is calculated in light of what we call the

7     *Sentencing Guidelines*, which are a series of directives that

8     tell me what the proper sentence should be, or a reasonable

9     sentence should be, for someone with your background who has

10    committed these kinds of crimes?

11         THE DEFENDANT:  I do, your Honor.

12         THE COURT:  Have you had an adequate opportunity to

13    discuss the *Sentencing Guidelines* with Mr. Weymouth, your

14    attorney?

15         THE DEFENDANT:  Your Honor, I have, and I have

16    researched them myself.

17         THE COURT:  And you understand that those are the

18    starting points for me making the determination of what the

19    proper sentence should be in this case?

20         THE DEFENDANT:  Absolutely, your Honor.

21         THE COURT:  And you understand I am not bound by what

22    the parties agree to here?

23         THE DEFENDANT:  I understand.

24         THE COURT:  I will make my own determination about

25    what the proper sentencing guidelines are going to be and,

1    ultimately, what the proper sentence is going to be.

2             Do you understand that?

3             THE DEFENDANT:  I do, your Honor.  And I understand

4    the *Sentencing Guidelines* are only advisory, and they don't

5    have -- I've also researched that, and I'm, you know --

6             THE COURT:  Just so you are clear, in this case I may

7    impose a sentence that is beyond what is agreed to here.

8             THE DEFENDANT:  I understand, your Honor.

9             THE COURT:  And if I do, and you do not like it, you

10   do not get to withdraw your plea.

11            THE DEFENDANT:  I understand, your Honor.

12            THE COURT:  Do you understand that?

13            THE DEFENDANT:  I do.

14            THE COURT:  Now, in this Plea Agreement we have the

15   reference to the sentencing recommendation that the parties are

16   going to make.

17            But, again, not one that is binding upon me, there is

18   a provision for the protection of assets for payment of

19   forfeiture or restitution.

20            Is that really an issue in this case, as a practical

21   matter?

22            MR. SHINE:  No, your Honor, it is not an issue.

23            THE COURT:  And then there are a series of agreements

24   having to do with your conduct after the sentence, and they

25   deal with whether or not the Government can argue on appeal the

1    correctness of the sentence, that sort of thing.  Have you

2    discussed that fully with your counsel, Mr. Weymouth?

3            THE DEFENDANT:  I have, your Honor, and I am also

4    familiar with that.  I believe it says that, if there was

5    anything that changed my Criminal History Category, the only

6    way that they could change the sentence is if I was found

7    factually innocent of that charge.

8            THE COURT:  And you understand that as provision 7(b)?

9            THE DEFENDANT:  I do, your Honor.

10            THE COURT:  Now, do you have any questions of me

11    regarding the Plea Agreement in this case?

12            THE DEFENDANT:  I really don't, your Honor.  I'm just

13    trying to go with the flow and, you know --

14            THE COURT:  Well, it is more than going with the flow,

15    Mr. Long.  There are two parts of this:  First, whether or not

16    you have voluntarily entered into this agreement; and, second,

17    whether or not it is going to be supported by substantial

18    evidence from which a finder of fact could find you guilty of

19    the offense charged.  And I am going to ask you at various

20    points here whether or not this is something that you

21    voluntarily entered into, and, second, whether or not the facts

22    that the Government alleges in this case are true.

23            Do you understand?

24            THE DEFENDANT:  I do, your Honor.

25            THE COURT:  Now, you had an opportunity, I take it, to

1    discuss this case fully with your counsel, Mr. Weymouth; is

2    that right?

3                THE DEFENDANT:  Yes, sir.

4                THE COURT:  Are you satisfied you have received from

5    him the kind of legal advice that you need to make your own

6    decision to plead guilty to this Information?

7                THE DEFENDANT:  Yes, your Honor.

8                THE COURT:  You understand you do not have to plead

9    guilty to an information at all?  An information is simply a

10   means by which the Government can charge an individual

11   directly.  It means that the Government, the United States

12   Attorney's Office, makes the determination of whether or not to

13   charge someone, and it involves an end run, frankly, around a

14   Constitutional provision that is designed to protect you, that

15   is, the right in a case as serious as this to be subject to

16   grand jury review and a determination of whether or not the

17   grand jury will permit the Government to proceed by an

18   indictment.  Do you understand that?

19               THE DEFENDANT:  I do, your Honor.

20               THE COURT:  You understand that the grand jury is a

21   group of 23 individuals, a majority of whom have to vote in

22   favor of an indictment before it can be returned, an indictment

23   perhaps in the form of this Superseding Information, and

24   sometimes the grand jury decides not to?  The grand jury

25   stands, more or less, as a screening device between a person

1    who is potentially to be accused of a crime and the Government,

2    which would like to accuse him of a crime.  And from time to

3    time the grand jury says no, they will not let the Government

4    go forward.  And if a grand jury says no, then the Government

5    cannot go forward.

6              Do you understand that?

7              THE DEFENDANT:  I do, your Honor.

8              THE COURT:  Except in one case, and that one case is

9    when someone agrees to proceed by an information.  Do you

10   understand that?

11             THE DEFENDANT:  I do, your Honor.

12             THE COURT:  So, you are giving up a very valuable

13   Constitutional right, the right to have a grand jury review the

14   charges in this form.  Do you understand?

15             THE DEFENDANT:  I do, your Honor.

16             THE COURT:  Have you had an adequate opportunity to

17   discuss with Mr. Weymouth that aspect of the case, that is, the

18   decision to proceed by Waiver of Indictment?  And there has

19   been passed up to me a copy of a Waiver of Indictment that you

20   executed today with Mr. Weymouth in this case.  But have you

21   discussed fully with him the pros and cons of doing that?

22             THE DEFENDANT:  Yes, your Honor.

23             THE COURT:  Now, with respect to the case itself, the

24   case is one that charges you with eight counts of armed bank

25   robbery, and the Government has to prove that you intentionally

1    took money belonging to a bank or some other institution that

2    is insured by a federal instrumentality while an employee of

3    the bank was present, that you used intimidation, or force or

4    violence when you did so, and that you were attempting to or

5    appeared to be attempting to use a dangerous weapon or device

6    or to assault someone or put someone's life in danger.  Do you

7    understand the Government has to prove those things?

8              THE DEFENDANT:  I do, your Honor.

9              THE COURT:  Now, in this case you have various kinds

10   of defenses that you might proceed on and various ways of

11   challenging the Government's evidence.  Have you discussed that

12   fully with Mr. Weymouth?

13             THE DEFENDANT:  I have, your Honor.

14             THE COURT:  Have you explored with him all the various

15   initiatives that you might pursue in defending against this

16   case?

17             THE DEFENDANT:  I have, your Honor.

18             THE COURT:  And are you satisfied that you have

19   received the kind of legal advice to make your own decision

20   about deciding to plead guilty instead?

21             THE DEFENDANT:  I have, your Honor.

22             THE COURT:  You understand you do not have to plead

23   guilty?  That is, under our system of justice, a person who is

24   accused of a crime is presumed innocent unless and until the

25   Government proves beyond a reasonable doubt every essential

1    element of the charge against that individual.  You do not have

2    to do anything at all.  You can sit back, look the Government

3    straight in the eye and say, "Prove it," and unless and until

4    they do, you cannot be found guilty, unless, of course, you

5    plead guilty.  Now, by pleading guilty, you are giving up that

6    presumption of innocence.  Do you understand that?

7              THE DEFENDANT:  I do, your Honor.

8              THE COURT:  And you have the right to challenge the

9    Government's case.  That is to say, Mr. Weymouth could

10   cross-examine the Government's witnesses, he could bring in

11   witnesses on your own behalf.  If the witnesses would not come

12   in here voluntarily, I would give him court process to force

13   them to come in here.

14             And you could take the witness stand yourself and tell

15   your side of the story, or you could choose not to.  And if you

16   chose not to, I would tell the jury, and I would observe this

17   principle myself, if the case were being tried to me, that we

18   cannot hold that against you.  That is a Constitutional right

19   as well.  It is the right to remain silent in the face of

20   criminal accusation, and we cannot burden that one way or the

21   other, either directly or indirectly, by drawing some

22   conclusions about your decision not to plead guilty.  That just

23   is not part of the case.  It is another way of forcing the

24   Government to its own proof without enlisting you in their

25   proof.

1          And you are giving up all of those rights as well.  Do

2    you understand that?

3          THE DEFENDANT:  I do, your Honor.

4          THE COURT:  Now, one of the things that I have to do

5    is satisfy myself that there is substantial evidence from which

6    a finder of fact could find you guilty of the offenses charged

7    in the Superseding Information.  So, I am going to turn to

8    Mr. Shine and ask him to tell us, briefly, what the evidence

9    would be if this case were to go to trial.  Do you understand?

10          THE DEFENDANT:  Yes, your Honor.

11          MR. SHINE:  Your Honor, this is a lengthy statement of

12    facts.  I will try to tighten it up as best I can.

13          I have pictures, too, which I can make available to

14    the Court, if necessary.  I've had them premarked and shown

15    them to my brother.

16          THE COURT:  If you are reading from a document, there

17    is tension between the idea of expedition and also making it

18    possible for the court reporter to hear.

19          MR. SHINE:  I have made an extra copy for the court

20    reporter.

21          Your Honor, if this case were to go to trial, the

22    Government's evidence would show the following:

23          On March 26th, 2009, at approximately 4:00, a white

24    male entered the Bank of America in Wellesley, located on

25    Washington Street.  The Bank of America, for the purposes of

1    our situation today, is a federally insured deposit bank

2    covered by the FDIC.

3          The individual was wearing a black jacket, a black

4    mask and a black hat obscuring his face.  The individual walked

5    into the bank, pulled out what appeared to be a black

6    nine-millimeter automatic handgun, pointed it at the teller.

7    He also reached into his pocket and pulled out a device which

8    appeared to be a bomb, and placed it on the countertop,

9    indicating that this was a robbery.

10          As he was doing this, the tellers indicated that they

11   heard a counting sound, somebody counting down from 27, 26, 25.

12   The individual then took the gun, pointed it at the bank

13   tellers, indicated that this was a robbery.  He received money,

14   stuffing it into a black nylon bag, and then fled the scene.

15          After the robbery, a post-robbery audit was conducted,

16   and it was determined that the individual took $24,474 in

17   United States currency.

18          On April 3rd of 2009, at approximately 3:41 p.m., a

19   white male entered the TD Bank North in Needham.  The TD Bank

20   North is an FDIC bank.  Upon entering the bank, the gentleman

21   pulled out a black handgun and a device which, again, appeared

22   to be a bomb, placed the device on the countertop, taking the

23   handgun, pointing it at the various tellers, indicating that

24   this was a robbery.  The individual stated it was a robbery,

25   asked them to give him the money.  The bank tellers gave him

1   the money.  He left the device on the -- the hoax bomb device

2   on the countertop and fled the area into the woods, receiving

3   $5,500 in United States currency.

4           On April 24th an individual at 3:00 entered the Bank

5   of America in Wellesley.  This was the same Bank of America

6   that was robbed a few days earlier.  This time the individual

7   was holding a black gun in his right hand, which he pointed at

8   a customer.  The customer actually came to the desk.  He

9   pointed the gun at the customer, demanded, This is a robbery,

10  smashing the gun on the ground, saying, Hurry up, hurry up,

11  both drawers, both drawers.  The teller put the money on the

12  counter.  The individual took the money and fled the scene on

13  foot into the backwoods.

14          An individual who was out back saw the individual

15  running through the yard and then jumping into a light-colored

16  silver car.  He could not tell the make of the car, only that

17  it had license plate number 456.

18          A post-robbery audit was conducted by the Bank of

19  America, again, an FDIC bank, and indicated that $4,139 was

20  taken from the bank.

21          On May 13th, 2009, at approximately 1:00, a white male

22  entered the Village Bank located in Newton.  The individual

23  took what appeared to be a black semiautomatic handgun out,

24  pointed it at a teller and indicated that this was a robbery,

25  give him the money, give him the money.  The individual took

1    the money, at which point the firearm, which turned out to be a

2    BB gun, was discharged into the back wall.  The individual took

3    the money and was leaving.

4         Throughout this robbery and the other three, all of

5    the tellers would tell us that they kept on hearing a counting,

6    somebody counting down, a voice.  They didn't know if it was a

7    cell phone or a walkie-talkie; they didn't know what was going

8    on.

9         The individual took the money, fled the scene.  A

10   post-robbery audit was conducted and indicated that the

11   individual took $3,111.05 of U.S. currency.

12        THE COURT:  I note that the five cents is not charged

13   in the Information.

14        MR. SHINE:  I apologize, your Honor.  It's a typo on

15   my side here.

16        THE COURT:  But, in any event, I treat that as at

17   least $3,111.

18        MR. SHINE:  Thank you, sir.

19        On May 29th, an individual, a white male, about 12:00,

20   entered the Ukrainian Credit Union.  The Ukrainian Credit Union

21   is a credit union which is insured by the National Credit Union

22   Association.

23        As the individual entered the Credit Union, he ran up

24   to the counter, producing a black gun.  He then stepped over

25   the counter, telling the tellers not to tell the police, not to

1    call the police, Faster, faster, it was a robbery, asked them

2    to give him money from the drawer.

3            The individual left the scene and into an awaiting

4    vehicle, which sped away.

5            A post-robbery audit was conducted and revealed that

6    the individual took $2,255 from the Credit Union.

7            On June 5th, at approximately 4:00 p.m., a white

8    male --

9            THE COURT:  Again, that is not what is charged in the

10   Information.  It is $2,250, not $2,255.  But, in this

11   connection, I will view this as within the scope of the

12   Information.

13           MR. SHINE:  Thank you, your Honor.

14           On June 5th, 2009, Bank of America in Dedham, an

15   individual about 4:00 p.m. entered the bank located on

16   Washington Street in Dedham.  He took a black handgun from his

17   waistband and produced an item which he put on the desk, which

18   appeared to be a bomb.  He told the tellers, No alarms, give me

19   the money, no dye pack, or I will shoot.

20           Again, the witnesses indicated that the individual was

21   in communication with another person on a radio or cellular

22   phone.  The individual took the money, left the bank.  A

23   post-robbery audit revealed that the suspect took $2,601 from

24   the bank.

25           June 16th, 2009, Sharon Credit Union, East Walpole.

1   Again, the Sharon Credit Union is insured by the National

2   Credit Union Association.  On June 16th about noontime, a white

3   male entered the Sharon Credit Union in East Walpole.  He was

4   observed exiting a small silver sedan driven by another

5   individual, a white male, who dropped him off and left.  The

6   individual produced a black semiautomatic handgun, telling

7   everybody to get down.  He walked up to teller windows,

8   pointing the gun at each teller, demanding money:  Give me your

9   big bills.

10        The individual took the money, placed it in a black

11   plastic bag and fled the scene.

12        A post-robbery audit was conducted and determined that

13   the individual took $7,385 in U.S. currency.

14        Now, after this, your Honor -- well, throughout this

15   whole period of time, the FBI's Bank Robbery Task Force was

16   attempting to profile an individual who fit this description of

17   these previous seven robberies.  They indicated that the

18   robberies were all conducted at the same kind of banks within a

19   circle of about ten miles apart.  The individual who committed

20   the robbery always had an accomplice who seemed to drive him

21   away.  The individual who committed the robberies always was

22   wearing a walkie-talkie or some sort of device.  The individual

23   always produced a black handgun, on three of the seven

24   robberies had a hoax device which appeared to be a bomb.  The

25   language was the same, the mannerisms, the body things, and

1    they felt they had a serial bank robber involved in all of

2    these robberies.

3         Based upon this, they started really combing through

4    the available surveillance tapes of inside the bank and outside

5    the bank.  While looking through the robbery pictures, the

6    sixth robbery for a very short period of time the individual's

7    facial features, in particular his nose and eyes were exposed.

8    One of the officers who was working the Task Force in Norfolk

9    County thought he might know who that individual was.  And he

10   thought, just because he had interacted with Mr. Long before,

11   that it reminded him, the eyes and the nose, of this gentleman

12   by the name of Dimitri Long.  There was nothing else at that

13   point.

14        Another group of officers focused on the outside

15   surveillance, and on two or three of the occasions, one, they

16   received a license plate of a silver, small car, and on two

17   other occasions they saw glimpses of a car which appeared at

18   the beginning of the robbery and at the end of the robbery.

19        With that, they took those pictures, and they

20   determined that the car was probably a late model Volkswagon

21   Jetta.  They actually went to a dealership and received

22   pictures from that and kind of coordinated that it, in fact,

23   was a Volkswagon Jetta.

24        So, now we had two big pieces of evidence.  They took

25   and they did a sweep of 20 miles from where all the robberies

1   were committed, and they got the names and addresses of every

2   Volkswagon Jetta, the 2005, in that general area.  They

3   actually went and put eyes on each one of those cars.  They had

4   a comprehensive list of about 200 cars.

5          As they combed through the list looking for something

6   to trigger similarities, they noticed that one of the vehicles,

7   just one of the vehicles, was owned by a gentleman by the name

8   of Michael Coty.  Michael Coty is known as Dimitri's long's

9   brother.

10          So, now they had two pieces of evidence.

11          THE COURT:  Three.

12          MR. SHINE:  Three pieces of evidence.

13          With that in mind, they then started following the

14   vehicle around, and they had a GPS monitor placed on the car.

15   The day of July 1st comes, 2009.  Police, FBI, they feel that

16   something might be happening this date, because the robber had

17   been quiet for a period of time.

18          They actually went to Mr. Coty's, the co-defendant's

19   home.  They observed the car, they observed an individual walk

20   outside the car, which they knew to be Coty, and an individual

21   they knew to be Dimitri Long get into the car and proceed away.

22   They kept back and they followed the car as the car drove

23   around the Needham/Dedham area, circling a number of banks on

24   three or four different occasions.

25          At one point, at 1:21 p.m., Mr. Long stepped from the

1  vehicle and put a hood up over his head.  He walked into the

2  Sovereign Bank.  He was in the bank for a period of about 28

3  seconds.

4        He came out of the bank, and at this point now the FBI

5  and the Norfolk County Police Departments of the various

6  communities had converged on the area.  They were waiting

7  outside the area as Mr. Long walked from the area.  As he was

8  seen with the hood up in the picture that we have shown you, he

9  walked out of the bank.  In his right hand he had what appeared

10  to be an automatic nine-millimeter pistol, he had a black nylon

11  bag similar to the bags that had been used in all the

12  robberies.

13        They ordered him to put the weapon on the ground,

14  which he complied with.  He attempted to flee.  He got about

15  15, 20 feet and was taken down.

16        The silver Volkswagen, which had been in the parking

17  lot under surveillance, fled the area.  That was stopped a very

18  short period of time later.  Mr. Coty was located in that

19  vehicle along with -- oh, he was actually located in a home

20  down the street.  A post-robbery audit revealed that the

21  individual took $9,555.

22        The individual, Mr. Coty, had a black -- the outfit

23  on; he had a walkie-talkie on his waistband put on channel

24  number 42.  The vehicle that was stopped, Mr. Coty, they

25  located -- he had ditched clothing and other items, but he also

1    had the black little walkie-talkie on.  He was also on channel

2    number 42.  I think there were 566 possible channels, and they

3    were on the same.

4         Both individuals were brought back to the police

5    station.  Mr. Coty made a statement to the police inculpating

6    himself in two or three of the robberies and indicated that his

7    brother might have been involved but wouldn't go beyond that.

8         Mr. Long at that time did not have any conversation

9    with the police and refused to discuss anything.

10        After the arrest, a search warrant was conducted at

11   Mr. Long's home, Mr. Coty's home, and two motor vehicles that

12   were used by Mr. Coty.  Hundreds of items were received from

13   the search warrants.  Those items were all consistent with

14   items of clothing that were worn by Mr. Long during the

15   robberies; in particular, an Adidas jacket, sweatshirts,

16   baseball hats, masks, gloves, all of the things that we

17   coordinated back and forth to say that he used this on this

18   robbery, he used this on this robbery.

19        They also found more radios.  They found a number of

20   BB guns that appeared to look like automatic handguns.  They

21   found ammunition for BB's, which appeared to be what had been

22   used -- to be loaded with.

23        They also found at Mr. Coty's house a cache of items

24   which were taped together identical in kind to the bombs that

25   were used.  Now, just for the record, they were not bombs; they

1    were hoax bombs.  They were rolls of paper wrapped in

2    cellophane, wrapped in duct tape, with wires and computer

3    components made to look like bombs.  And they found all of that

4    stuff back at Mr. Coty's house.

5           A few weeks before today Mr. Long agreed -- in

6    consideration of our Plea Agreement, Mr. Long agreed to be

7    interviewed by the FBI.

8           THE COURT:  I am sorry.  When you said "Mr. Coty's

9    house" --

10          MR. SHINE:  Mr. Coty's house, where Mr. Long had

11   access --

12          THE COURT:  Right.

13          MR. SHINE:  -- his half-brother.

14          Mr. Long a few weeks back agreed to be interviewed by

15   the FBI.  During that interview, which was conducted by Special

16   Agent Eric Toole of the FBI, Mr. Long had an opportunity to

17   discuss each one of the incidents.

18          Mr. Long over this two-hour period went through each

19   robbery with the FBI, gave them specific details as to clothing

20   he was wearing, type of robbery, where he parked his car, who

21   was with him, the use of the walkie-talkies, the handguns.  He

22   basically went through each and every robbery with very

23   specific, specific -- that only a person who would be involved

24   in the robbery would do.

25          Mr. Long was then shown pictures of each robbery

1    similar to the pictures that are before the Court today in

2    evidence.  On each of those situations Mr. Long was asked, Is

3    that you in the robbery?  Mr. Long indicated it was him, and he

4    initialed each page.

5            I apologize for any little mistakes, but that would

6    generally be a summary --

7            THE COURT:  It is not so much mistakes, but it is

8    within the scope of the Information, which talks in terms of,

9    more or less, the dollars involved.

10           MR. SHINE:  And that would be a summary of the

11   Government's evidence, had the case gone to trial, your Honor.

12           THE COURT:  All right.

13           MR. SHINE:  Thank you, your Honor.

14           THE COURT:  So, Mr. Long, you have heard what the

15   Government tells me the evidence would be in this case if it

16   were to go to trial.  Do you disagree with anything that the

17   Government said?

18           THE DEFENDANT:  No, your Honor.  I will accept

19   responsibility for all my actions.  I just want it to be noted

20   that I take responsibility for all my actions.  I'm not

21   pointing the finger at nobody else.  I mean, my co-defendant,

22   he took responsibility for his actions and implicated me, but

23   in no way am I trying to implicate nobody, and I'm just taking

24   responsibilities for everything that I did, and I'm just trying

25   to clear it up.

1          THE COURT:  So, you do not dispute anything that the

2    Government said here?

3          THE DEFENDANT:  I don't.

4          THE COURT:  That is what happened?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Mr. Shine, do you know of any reason I

7    should not accept the plea to the Superseding Information?

8          MR. SHINE:  I do not, your Honor.

9          THE COURT:  Mr. Weymouth, do you know of any reason I

10   should not accept a plea to the Information?

11         MR. WEYMOUTH:  I do not, your Honor.

12         THE COURT:  Based on the discussion we have had, I am

13   satisfied that the decision to proceed by Waiver of Indictment

14   by Mr. Long is a knowing and voluntary act on his part.

15         So, now I am going to ask Mr. Lovett to inquire of

16   Mr. Long regarding his plea to the Superseding Information.

17         THE CLERK:  Mr. Long, on Criminal No. 09-10210, Counts

18   One through Eight of the Superseding Information charging you

19   with Armed Bank Robbery in violation of Title 18 United States

20   Code 2113(a)(d), including Aiding and Abetting in violation of

21   Title 18 United States Code 2, what say you as to Counts One

22   through Eight, guilty or not guilty?

23         THE DEFENDANT:  Guilty.

24         THE CLERK:  Thank you.

25         THE COURT:  You may be seated.

1          Based on our discussion this morning, I am satisfied

2     that your decision to plead guilty to the Superseding

3     Information is a knowing and voluntary act, and that it is

4     supported by substantial evidence from which a finder of fact

5     could find you guilty of the offenses charged.  You are now

6     adjudged guilty of those offenses.

7          The next matter in this case will be the sentencing,

8     formal matter, and that will take place on February 22nd at

9     2:30 p.m.  What is going to happen now is that the Probation

10    Office of this Court will prepare a Presentence Report.  It is

11    a document I rely on very heavily to make my own judgment about

12    what the proper sentence should be.  It is very much in your

13    best interest but also an obligation that you have to cooperate

14    fully with the Probation Office in preparation of the

15    Presentence Report so that they can bring to my attention

16    things that they think I should know, you can bring to my

17    attention things that you think I should know.

18         You and Mr. Weymouth will get a chance to review the

19    Presentence Report in a draft form.  If you are not satisfied

20    with the draft, you can ask the Probation Office to make

21    changes or corrections.  If they do not make those changes and

22    corrections to your satisfaction, then you can bring the matter

23    up to me at the time of sentencing, and at the time of

24    sentencing both you and Mr. Weymouth will have an opportunity

25    to address me in open court about the factors that I should

1    have in mind in making my judgment in this case.

2            Do you understand?

3            THE DEFENDANT:  Your Honor, yes.  Can I just say one

4    thing?

5            THE COURT:  Sure.

6            THE DEFENDANT:  You know, in light of all the

7    circumstances, February 22nd is my mother's birthday.  My other

8    brother just died in my hands.  My other brother my mother

9    hasn't talked to in years.  If I get sentenced on that date

10   it's going to break her heart.  Is there any way we could just

11   change that date, just because my mother's been through

12   absolute hell, and that would be the tip of the iceberg that

13   puts her in a mental hospital?

14           I'm sorry to even ask that.  It's just that I'm all

15   she's got left, and my mother has nobody else and I'm in fear

16   for her mental welfare, and she's having a real, real hard time

17   as it is.  I'm the only son she's got left, and that's her

18   birthday, you know.

19           THE COURT:  Well, if we set it for February 28th?

20           THE DEFENDANT:  Thank you so much.

21           THE COURT:  So, it will be February 28th at 2:30.

22           Anything else that we need to take up?

23           MR. SHINE:  There would be nothing else from the

24   Government, your Honor.  Thank you very much, sir.

25           THE COURT:  Thank you.

1          MR. WEYMOUTH:  Nothing, Judge.

2          THE COURT:  We will be in recess.

3          THE CLERK:  All rise.

4     (The Honorable Court exited the courtroom at 9:55 a.m.)

5     (WHEREUPON, the proceedings adjourned at 9:55 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Brenda K. Hancock, RMR, CRR and Official Reporter
of the United States District Court, do hereby certify that the
foregoing transcript constitutes, to the best of my skill and
ability, a true and accurate transcription of my stenotype
notes taken in the matter of *United States of America v.*
*Dimitri Long*, No. 1:09-cr-10210-DPW.

Date: January 5, 2011          /s/ *Brenda K. Hancock*

                               Brenda K. Hancock, RMR, CRR

                               Official Court Reporter